

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 30, 2020

By ECF

The Honorable Edward R. Korman
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Afrim Kupa
>        Criminal Docket No. 11-345 (ERK)

Dear Judge Korman:

The government respectfully submits this response in opposition to defendant Afrim Kupa's motion for a modification of an imposed term of imprisonment, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), filed on April 26, 2020. The defendant seeks a reduction of his sentence due to the COVID-19 ("COVID-19" or "coronavirus") pandemic. As set forth in further detail below, the defendant has (1) failed to satisfy statutorily-mandated exhaustion requirements prior to seeking relief from this Court, and (2) has not met the heavy burden of establishing that his circumstances warrant compassionate release. The motion, therefore, should be denied.

## FACTUAL BACKGROUND

I.    The Defendant's Offense Conduct

On April 10, 2013, the defendant pleaded guilty to conspiracy to possess with intent to distribute cocaine between January 2005 and January 2012, in violation of 21 U.S.C. Section 846. Specifically, the defendant and his brother co-defendant Lulzim Kupa were narcotics dealers based in Staten Island who supplied multi-kilogram amounts of cocaine and marijuana to, among other individuals, co-defendant Joseph Sclafani, a member of the Gambino crime family.

The defendant's criminal history is extensive. In addition to the instant narcotics conviction, the defendant was convicted in 1999 of bank fraud in the Southern District of New York and sentenced to 33 months' imprisonment. In 1999, he was also convicted of racketeering and bank burglary in the Eastern District of New York and sentenced to 37

months' imprisonment.  In 2000, he was convicted of narcotics trafficking in the Eastern District of New York and sentenced to 84 months' imprisonment.  In 2010, he was convicted of bank burglary, again in the Eastern District of New York, and sentenced to 46 months' imprisonment by Judge Jack B. Weinstein.

Importantly, the defendant committed the instant narcotics offense after Judge Weinstein had sentenced him on the burglary conviction in 2010 and placed the defendant on home confinement while pending his self-surrender date.  Indeed, while confined to the Staten Island home that he shared with his wife and two young children and to which he now asks the Court to release him on home confinement, the defendant stored, cut and distributed multi-kilogram amounts of cocaine from the residence.  At the time of his arrest in August 2011, pursuant to a search warrant, agents seized a kilogram of cocaine, two cocaine "presses," three digital scales and cellphone jammer from the defendant's home.

At his sentencing hearing in the instant case in 2013, Judge Gleeson found that the defendant's criminal history category was level VI and sentenced him to 132 months' imprisonment to run consecutively to the 46-month term of imprisonment imposed by Judge Weinstein on the burglary conviction.  According to BOP records, the defendant's projected release date (with application of good credit time) is April 2024; his maximum release date is April 2026.

## II.    COVID-19 and the Bureau of Prisons

In response to the COVID-19 pandemic, the Bureau of Prisons (the "BOP") is currently implementing national measures to mitigate the spread of the virus within prisons. See Federal Bureau of Prisons resources page, available at https://www.bop.gov/coronavirus/; Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  These measures, which have been implemented at Lewisburg, include the following:

- Suspension of all social and legal visits:  Social visits and legal visits have been suspended for 30 days, with case-by-case accommodations for attorney visits and legal calls.  Inmates will be provided additional inmate telephone minutes each month.
- Inmate movement:  All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.
- Screening and testing of inmates:  All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors are quarantined.  In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- Modified Operations:  The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.  That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).  Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

Effective April 1, 2020, the BOP implemented additional procedures to ensure the safety and wellbeing of inmates, including efforts to significantly decrease incoming movement to all BOP facilities.

As of April 16, 2020, the BOP has reported that 14 inmates and 7 guards at Otisville have tested positive for coronavirus, with no deaths.  See Federal Bureau of Prisons resources page, available at https://www.bop.gov/coronavirus.

ARGUMENT

III.    The Defendant is Not Entitled to a Modification of his Sentence

The defendant seeks early release and a period of home confinement based on concerns relating to the coronavirus pandemic.  The motion lacks all merit.  As a threshold matter, the defendant has failed to administratively exhaust his remedies within the BOP as required under 18 U.S.C. § 3582(c)(1)(A)(i).  Moreover, the defendant fails to establish that the circumstances outline in the motion justify compassionate release.  Accordingly, the motion should be denied.

A.    Applicable Law

1.    Exhaustion Under 18 U.S.C. § 3582(c)(1)(A)(i)

Title 18, U.S.C., § 3582(c)(1)(A)(i), commonly referred to as the "compassionate release" statute, permits a Court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons."  See United States v. Zullo, 09-CR-64, 2019 WL 7562406, at *1 (D. Vt. Sept. 23, 2019).  A motion for compassionate release under

18 U.S.C. § 3582(c)(1)(A)(i) may be made by either the BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id.[1] Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment. Id.

Significantly, Section 3582(c)'s exhaustion requirement is statutory, and thus is not a judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." Ross v. Blake, 136 S. Ct. 1850, 1857 (2016). Indeed, statutory exhaustion requirements "stand[] on a different footing." Id. There, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." Id. Where, as here, a statute makes clear that a defendant must show that he has "fully exhausted all administrative rights," the defendant cannot be excused from that obligation. See Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); Theodoropoulos v. I.N.S., 358 F.3d 162, 172 (2d Cir. 2004) ("[A]s a general rule, courts are required to strictly enforce statutory exhaustion requirements"); United States v. Gross, No. 15-CR-769 (AJN), 2020 WL 1862251, at *1 (S.D.N.Y. Apr. 14, 2020) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text." (quoting Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94 (2d Cir. 1998)); cf. Fry v. Napoleon Community Schools, 137 S. Ct. 743, 750 (2017) (stating that statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims).

Consequently, a court lacks the authority to grant a defendant's compassionate release motion absent exhaustion of the administrative remedies, as numerous courts, including the only Court of Appeals to have addressed the issue, have held.[2] See United States

---

[1] The defendant claims that he filed a request with Lewisburg on April 2, 2020. The institution, however, has no record of the defendant's request.

[2] While the "Second Circuit has not yet answered the question of whether § 3582(c) is jurisdictional, several courts of appeals" have interpreted it thusly. See, e.g., United States v. Monzon, No. 99-CR-157 (DLC), 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (citing cases); but see United States v. Taylor, 778 F.3d 667 (7th Cir. 2015) (holding that § 3582(c) is not jurisdictional)). In any event, the exhaustion requirement of Section 3582(c)(1)(A), at a minimum, is a mandatory claim-processing rule and must be enforced if, as the government has done here, a party "properly raise[s]" it, Eberhart v. United States, 546 U.S. 12, 16 (2005) (per curiam) (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a non-jurisdictional, but mandatory claim-processing rule). See also, e.g., Monzon, 2020 WL 550220, at *2 (noting that even if the exhaustion requirement is not jurisdictional, it is a "statutory exhaustion requirement" that must be "strictly enforced"); Gross, 2020 WL 1862251, at *4 (finding that the exhaustion requirement was not jurisdictional, but still mandatory as it constitutes a "claim-processing rule").

v. Raia, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (holding that "any remand" to the district court to consider a compassionate release motion "would be futile" in light of the defendant's failure to exhaust, which "presents a glaring roadblock foreclosing compassionate release"); Gross, 2020 WL 1862251, at *2 (finding the exhaustion requirement mandatory but noting disagreement among district courts); United States v. Roberts, No. 18-CR-528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (noting that "[c]ourts do have some flexibility to disregard exhaustion requirements when they are judicially imposed" but, "[a]s the Supreme Court has emphasized . . . 'a statutory exhaustion provision stands on different footing'" (quoting Ross, 136 S. Ct. at 1857); United States v. Hernandez, No. 19-CR-834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020) (finding that the compassionate release provisions of the FSA did not apply because "Mr. Hernandez does not appear to have sought any such relief within the BOP, let alone exhausted his administrative remedies"); United States v. Cohen, No. 18-CR-602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020) ("As the Government points out, he is 'manifestly ineligible' for compassionate release and has not exhausted his administrative remedies."); United States v. Gileno, No. 19-CR-161 (VAB), 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) ("As a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action. As a result, the Court cannot consider his motion to modify his sentence."); Monzon, 2020 WL 550220, at *2 (noting that several Courts of Appeals have held that § 3582(c)'s exhaustion requirement is a "jurisdictional bar" to review in the district court, but declining to resolve the issue because even if it not jurisdictional, it is a "statutory exhaustion requirement" that must be "strictly enforced," and the defendant failed to satisfy that requirement); United States v. Bolino, No. 06-CR-806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020) ("The submission of a sufficient record to show exhaustion, at least to the extent of the [BOP's] General Counsel's rejection of an appeal, is fundamental to this Court's function in deciding a compassionate release motion. Congress clearly wanted these applications decided at the administrative level if possible.").[3]

Finally, 18 U.S.C. § 3582(c)(1)(A) requires that a defendant "fully exhaust all administrative remedies" within the BOP unless the warden of the inmate's institution fails to act on the inmate's petition (i.e., there is a "lapse") within 30 days. If the warden acts on the inmate's request within 30 days, and denies the request, the inmate must then exhaust his administrative remedies, including administrative appeal to the BOP, as set forth in 28 C.F.R.

---

[3] But see, e.g., United States v. Zuckerman, No. 16-CR-194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) ("[T]he Court holds that Zukerman's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic."); United States v. Perez, No. 17-CR- 513 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (finding that exceptions to the exhaustion requirement apply, emphasizing that the defendant's three week sentence would expire before the exhaustion period ends).

§§ 542.10–19.[4]  Where a defendant has fully and properly exhausted his administrative rights, or the warden has failed to take action on a defendant's request within 30 days, the defendant may then bring a motion for compassionate release before a district court.

---

[4] Several district courts across the country, including at least one in this district, have found that inmates must pursue administrative appeal prior to seeking relief in court. See, e.g., United States v. Weidenhamer, No. 16-CR-1072 (PHX), 2019 WL 6050264, at *4 (D. Ariz. Nov. 8, 2019) ("In these circumstances, the Court concludes the better reading is to require administrative exhaustion if a warden acts on a request within 30 days. . . .  If the warden acts on that request in a timely matter, it is appropriate to require a defendant to pursue an administrative appeal.  That is consistent with the general preference that courts take advantage of agency expertise when possible."); United States v. Miller, No. 16-CR-269 (BLW), 2020 WL 113349, at *2 (D. Idaho Jan. 8, 2020)  ("It seems odd that Congress would allow a defendant to short-circuit the Bureau of Prison's administrative procedures simply by waiting 30 days after filing his request, despite the warden timely acting on that request." (citation omitted)); Bolino, 2020 WL 32461, at *1 (instructing that "[i]f the prison warden denies that request [from the inmate], the prisoner must appeal the denial through the BOP's Administrative Remedy Procedure"); United States v. Eisenberg, No. 16-CR-157 (LM), 2020 WL 1808844 (D.N.H. Apr. 9, 2020) ("[B]efore a district court may consider a compassionate release motion filed directly by a defendant, the defendant must demonstrate that he has either exhausted his administrative rights to appeal BOP's refusal to bring a motion for compassionate release on his behalf or that BOP has ignored his request for compassionate release for 30 days."); United States v. Korn, No. 11-CR-384S (WMS), 2020 WL 1808213, at *2 (W.D.N.Y. Apr. 9, 2020) ("The exhaustion requirement is met if the defendant establishes either (1) that the Bureau of Prisons denied his or her request that it bring a compassionate-release motion and he or she fully exhausted all administrative appeal rights with respect to that denial, or (2) that the warden of the facility took no action on his or her request for the filing of a compassionate-release motion within 30 days of receiving it."); United States v. Brummett, No. 07-CR-103-(DCR), 2020 WL 1492763, at *1 (E.D. Ky. Mar. 27, 2020) ("Because the warden explicitly denied his request, Brummett needed to exhaust his administrative remedies to appeal the warden's denial before filing."); but see United States v. Woodson, No. 18-CR-845 (PKC), 2020 WL 1673253, at *1 (S.D.N.Y. Apr. 6, 2020) (stating that "[i]f the BOP denies the defendant's application in fewer than 30 days, then the defendant may immediately apply to the Court"); United States v. York, Nos. 11-CR-76, 12-CR-145 (TWP), 2019 WL 3241166, at *6 (E.D. Tenn. July 18, 2019) (finding that "[b]ecause 30 days have passed since [the defendant's requests to BOP], the Court has authority to hear this matter under § 3582(c)(1)(A).").

## 2.     Criteria for Compassionate Release

The Guidelines and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).     See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)") (available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf). Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or registered partner. See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the Court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

## B.     Analysis

### 1.     The Defendant Has Not Exhausted His Administrative Remedies

Prior to seeking relief from this Court, Kupa must exhaust his administrative remedies with the BOP. He has failed to do so. Accordingly his motion is not ripe for review and should be denied. In his submission, the defendant states that he made a request for compassionate release to the Warden of Lewisburg on April 2, 2020. The government has been notified by Lewisburg staff that the institution has no record of the defendant's request. Even assuming arguendo that the defendant made a proper request that meets the BOP's minimum requirements,[5] the defendant remains well short of satisfying exhaustion of his administrative remedies. As discussed above, such exhaustion is a mandatory component of the First Step Act ("FSA") statutory framework, and the court lacks the authority to grant compassionate release at this time.

---

[5] Pursuant to BOP policy, a request for compassionate relief must "ordinarily" be done in writing, and must contain "at minimum," "(1) The extraordinary or compelling circumstances that the inmate believes warrant consideration" and "(2) Proposed release plans, including where the inmate will reside, how the, inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment." BOP Program Statement 5050, § 571.61, available at https://www.bop.gov/policy/progstat/5050_050_EN .pdf. The government has been notified by Lewisburg staff that the institution has no record of the defendant's request. Even assuming arguendo that the defendant made a proper request that meets the BOP's minimum requirements, the defendant remains well short of satisfying exhaustion of his administrative remedies.

There is good reason to reject the defendant's request that the Court ignore the statutorily-imposed 30-day window required before considering a compassionate release application. Most significantly, the 30-day period provides the BOP with the ability to develop a record upon which it—and subsequently the district court—can make a determination about the inmate's request for release. Bolino, 2020 WL 32461, at *1 (upholding the exhaustion requirement and noting that it is "particularly important to at least give the BOP an opportunity to state its reason for denying the application so that the court can review those reasons"); Weidenhamer, 2019 WL 6050264, at *4 (upholding the exhaustion requirement and noting "the general preference that courts take advantage of agency expertise when possible"). After having an opportunity to review all the facts available to them, the BOP could determine that release was warranted; however, the defendant, in bypassing the process altogether, has denied the BOP the opportunity to make this assessment.

There are many challenging factors to consider during this pandemic, and the BOP should have the opportunity to assess those factors during the statutorily-required review period. For example, notwithstanding the current pandemic, the BOP must carry out its charge to incarcerate sentenced criminals and must consider the effect release of prisoners may have on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care. And it must consider myriad other factors, including the availability of transportation for inmates (during a period in which interstate transportation services often used by released inmates are providing reduced, if any, service), and of supervision of inmates once released (during a period in which the Probation Department has necessarily cut back on home visits and supervision). Judicial review will be all the more effective if it occurs after the BOP is given an opportunity to assess the interplay of these various concerns for a given defendant.

The defendant's motion, therefore, is premature and should be denied.

2.    The Defendant's Medical Conditions Are Not Extraordinary and Do Not Form a Basis to Grant Compassionate Release

Although the Court need not reach the merits of the defendant's motion due to his failure to meet the statutory exhaustion requirements, the defendant has also failed to meet the heavy burden of establishing that his circumstances offer the kind of "extraordinary and compelling" reasons that justify compassionate release.

While the defendant alleges that his hypertension condition warrants his compassionate release, the defendant has provided insufficient grounds to conclude that his condition is serious or would otherwise place him in the category of individuals who would have a heightened risk of complications if they contracted COVID-19. Aside from mentioning that he takes medication to control his high blood pressure, the defendant provides no details

8

about the severity of his hypertension, the extent to which it is under control by the medication, or any other information that renders it serious or otherwise extraordinary.

At the same time, the defendant's BOP medical records indicate that the defendant's hypertension is being controlled by medication.[6]  He began taking the medication in March 2019 and since then his blood pressure has been regularly monitored by BOP medical staff.  In May 2019, during a routine, follow-up visit, the defendant told BOP medical staff that since taking the prescribed medication, his blood pressure, which the defendant had been measuring on a public machine located at the facility, had been "perfect, 110s-120s," and that he had suffered no adverse side effects from the medication.  BOP records indicate that his blood pressure that day was 109/79, which is well within the normal range.  See https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982 (noting that blood pressure below 120/80 considered normal).  At the defendant's routine follow-up medical visit in August 2019, his blood pressure was 111/73; in November 2019, it was 111/65; and in February 2020, it was 109/68.  At the February 2020 visit, the defendant told medical staff that he does not check his blood pressure but takes medication and has no problems with his blood pressure.  The defendant's medical records indicate that his blood pressure is being monitored by BOP staff and that it is under control.  Accordingly, his hypertension is not an extraordinary condition necessitating his release.

Even if his hypertension were not under control, that condition, by itself, would not warrant the defendant's release.  Approximately 46% of adults in the United States suffer from hypertension, or high blood pressure.  See American Heart Association, "Cardiovascular diseases affect nearly half of American adults, statistics show," available at https://www.heart.org/en/news/2019/01/31/cardiovascular-diseases-affect-nearly-half-of-american-adults-statistics-show (noting that as of last year, approximately 46% of American adults suffered from hypertension) (last visited on April 17, 2020).  While certain studies suggest that hypertension may place the defendant more at risk from coronavirus-related effects,[7] this unfortunate fact is true for nearly half of all Americans, which suggests that his

---

[6] The government has provided a copy of the defendant's medical records for the period from April 2018 to April 2020 to defense counsel.

[7] Whether that linkage constitutes causation or instead correlation with elderly or otherwise at-risk populations is still unclear.  Karina Zaiets & Padilla, Ramon, "Coronavirus, diabetes, obesity and other underlying conditions: Which patients are most at risk?" USA Today, available at https://www.usatoday.com/in-depth/news/2020/04/15/coronavirus-risk-90-patients-had-underlying-conditions/2962721001/ (last visited on April 17, 2020) (noting that "[t]here is not enough evidence to suggest a link between COVID-19, hypertension and cardiovascular diseases.  Age might be the primary factor.  Older people are more likely to suffer from diabetes, obesity and high blood pressure, risk factors for heart disease.  Their immune systems are more susceptible to infection.").

condition is closer to "ordinary" than "extraordinary."  See United States v. Gagne, No. 18-CR-242, 2020 WL 1640152, at *3 (D. Conn. Apr. 2, 2020) ("While the defendant's medical condition [Multiple Sclerosis] may present challenges in adjusting to incarceration, her condition is neither extraordinary nor compelling.  A Bureau of Justice Statistics report found that 40% of jail and prison inmates have a current chronic medical condition.").  This is particularly true to the extent the defendant's reported hypertension is readily controlled by medication and he has no adverse effects from condition.

Additionally, among the factors considered by the BOP in analyzing and authorizing release plans is whether the "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19."  Memorandum for the Director of the Bureau of Prisons from the Attorney General, "Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic," March 26, 2020 (last visited on April 17, 2020), available at    https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf.  Public sources suggest that New York City is among those regions with the highest rate of infection.  Accordingly, it is not at all clear that the defendant's proffered location for home confinement is actually safer than Lewisburg for someone in the defendant's position, and it may, in fact, subject him to greater exposure to the virus.

The lack of a full record on these important matters reinforces the wisdom of requiring a defendant to exhaust his administrative rights prior to seeking relief from the Court.  By circumventing the exhaustion requirement, the defendant seeks to prevent the BOP from properly considering whether he is entitled to relief.  Moreover, by proceeding in such a manner, the defendant asks this Court to act in a procedural posture outside of its customary role by pressing it to make findings based on a nearly non-existent record, rather than review the agency's statutorily-required decision-making process. This concern—that the defendant's failure to properly exhaust his administrative remedies prevents the Court's ability to make careful and considered findings—is particularly acute in situations where, as is the case here, the defendant has violated past orders of the Court while on pre-trial release when it suited his interests.

Finally, any relief issued by the Court must still be analyzed using the factors listed in 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A).   The defendant is a career criminal, having spent the majority of his adult life in prison and the significant prison term imposed by Judge Gleeson reflected the defendant's extensive criminal history and the need to protect the public by incapacitating him.  Moreover, the defendant has repeatedly flouted the Court's orders when it suits his purpose, including running his extensive narcotics business out of his home after Judge Weinstein had permitted him to self-surrender.  To permit the defendant an early release to return to the place from which he operated his criminal scheme would not serve to satisfy the factors in Section 3553(a).

The government recognizes the seriousness of COVID-19, however, the risk of potential exposure to the coronavirus in a BOP facility cannot—and should not—alone form the basis to grant a prisoner's motion for release, particularly in a case such as this one where

the defendant's risk factors cannot be described as "extraordinary and compelling."  The motion, therefore should likewise be denied on the merits.

CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motion for modification of his sentence and compassionate release.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
Robert Polemeni
(718) 254-6044

cc:     James R. Froccaro, Jr. (by ECF)
Clerk of Court (by ECF)

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/ Robert Polemeni
Robert Polemeni
Assistant U.S. Attorney
(718) 254-6044